IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| TANJA THOMPSON, | ) | Civil No. 05-841-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner, Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

    Rory Linerud
    P.O. Box 1105
    Salem, OR 97308

        Attorney for Plaintiff

    Karin J. Immergut
    U. S. Attorney, District of Oregon
    Neil J. Evans
    Asst. U.S. Attorney
    1000 S.W. Third Avenue, Suite 600
    Portland, OR 97204-2902

        Attorneys for Defendant


FINDINGS AND RECOMMENDATION - 1

JELDERKS, Magistrate Judge:

Plaintiff Tanja Thompson brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security denying her application for Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 1381-1383f.  This action should be remanded for an award of benefits.

<u>Procedural Background</u>

Plaintiff previously filed an application for disability benefits on January 30, 1997.  That application was denied initially and plaintiff did not appeal that denial.

Plaintiff filed her present application for SSI benefits on November 20, 2001, alleging that she had been disabled since November 20, 2001, because of depression, problems with her hands and legs, weakness, chest pain, and fluctuating weight. The application was denied initially on March 11, 2002, and was denied on reconsideration on August 26, 2002.

Based on plaintiff's timely request, a hearing was held before Administrative Law Judge (ALJ) Thomas Tielens on May 14, 2003.  Plaintiff, who was represented by counsel, testified at the hearing.  Also testifying was Kathryn Heatherly, a Vocational Expert (VE).

In a decision issued September 26, 2003, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act because she had the residual functional capacity (RFC) to perform her past relevant work. Thereafter, on January 13, 2004, the Appeals Council granted plaintiff's request for review and remanded her claim to the ALJ for further proceedings.[1]

A new hearing was held on September 1, 2004. Plaintiff, who continued to be represented by counsel, testified at the hearing. Also testifying was Clark A. Thompson, plaintiff's husband. At the conclusion of this hearing, the ALJ decided to order a psychological exam of plaintiff to assist him in assessing whether she was "able to sustain work, day-in and day-out." The Plaintiff underwent Neuropsychological Screening on October 16, 2004.

In a decision issued on March 11, 2005, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act because she had the residual functional capacity (RFC) to perform her past relevant work as a janitor as well as

---

[1]    The ALJ was instructed on remand to consider the opinion of Dr. Regina Lanter, plaintiff's treating physician and provide a rationale for the weight given that opinion; provide a rationale for how he reached his conclusions regarding plaintiff's mental limitations; further evaluate claimant's subjective complaints and written lay evidence; and if warranted, obtain supplemental VE evidence to clarify the effect of plaintiff's limitations on her occupational base.

FINDINGS AND RECOMMENDATION - 3

other work that existed in significant numbers in the national
economy.    That decision became the final decision of the
Commissioner on May 5, 2005, when the Appeals Council denied
plaintiff's request for review.    In the present action,
plaintiff appeals from that decision.

<u>Factual Background and Medical Evidence</u>

Plaintiff was born on June 19, 1973, and was 31 years old
when the ALJ filed the decision at issue here.  She attended
high school until the age of 14, and later obtained a GED.[2]  She
also has some vocational training.  She has past relevant work
experience as a production assembler, data entry operator,
janitor, cashier, and retail sales clerk.

Plaintiff has a substantial history of depression,
sometimes accompanied by suicidal ideation.  The record
contains several notes detailing plaintiff's abusive and
traumatic childhood growing up in Mississippi.  Plaintiff
reports that when she was very young (2 or 3 years old) and woke
up at night crying, having wet the bed, her mother would lock
her out of the house with only a pillow.  This started what
turned into a lifelong habit of rubbing a pillow for comfort.
In addition, plaintiff asserts that her mother abused drugs,
beat her, and exposed her to numerous abusive boyfriends.

---

[2]    Plaintiff became pregnant with her oldest son at age
14, and within a year of his birth, became pregnant with her
second child.

FINDINGS AND RECOMMENDATION - 4

According to plaintiff, when she was 17 she stabbed one of her mother's boyfriends in the back to stop him from beating her mother. Following this incident, plaintiff's grandmother arranged for plaintiff and her two children to move to Portland to live with an aunt.

In August 1994 plaintiff was admitted voluntarily to OHSU with suicidal and homicidal ideation. According to the admission record, she had specific plans to kill her two children and herself by overdose. The staff physician diagnosed her with major depressive disorder and dysthymic disorder. On discharge, she was instructed to follow-up with her treating physician about adjusting her medications.

From October 1996 to March 2002, plaintiff received extensive mental and physical health care from the Multnomah County Health Department. The voluminous record reveals that plaintiff repeatedly presented with depression, low energy, loss of appetite, anxiety, feelings of hopelessness, and other medical problems. Doctors prescribed a number of different antidepressants, including Doxepin, Paxil, and Zoloft, to help with plaintiff's depression. In addition, in March 1997, plaintiff admitted that she had suffered from a significant marijuana addiction since the age of 17, and sought help in quitting. She admitted to daily marijuana use and taking 10-20 "hits" a day. The records indicate that in June 1997 plaintiff

quit using marijuana and suffered withdrawal symptoms as a result. Notably, the progress notes from June 1997 to approximately February 1998, reveal that plaintiff's depression improved during this period and that she felt more hopeful about her future.[3]

By November 1999, plaintiff once again began presenting with increased depression, anxiety, fatigue, crying and OCD symptoms: hand rubbing and an obsession with doing hundreds of sit-ups a day. Plaintiff continued to participate in a jobs program during this period and though a few progress notes indicate some improvement, overall, plaintiff continued to struggle with significant depression.

Between December 1999 and March 2002, plaintiff presented to the Emergency Room at Providence Portland Medical Center approximately nine times. On December 7, 1999, plaintiff presented to the ER with chest tightness, was diagnosed with an upper respiratory infection with reactive airway disease and was advised to follow up with her primary care physician (PCP). The illness and social history taken from plaintiff at that ER

---

[3]    In November 1997, however, plaintiff reported that she had been fired from her janitorial job, and in December 1997 she reported being depressed over her unemployment. Moreover, plaintiff continued to take antidepressants during this period.

FINDINGS AND RECOMMENDATION - 6

admission indicated that "[s]he does smoke marijuana . . . about every other day."[4]

On February 11, 2000, plaintiff presented to the ER with vomiting and diarrhea, was given  an IV and medication to help with nausea, diagnosed with viral gastroenteritis and dehydration, and advised to follow with her PCP if symptoms persisted.

On June 27, 2000, plaintiff presented to the ER with rectal bleeding, was diagnosed with rectal bleeding likely secondary to external hemorrhoid, given medications, and advised to return to the Northeast Health Clinic for a checkup.  The history taken from plaintiff indicated that she suffered from depression and was taking Penicillin, Doxepin, Potassium Chloride, and Paxil.

On August 29, 2001, plaintiff presented to the ER with vomiting and upper right quadrant pain.  She was admitted for a cholecystectomy the next day.  The history taken from plaintiff indicated she suffered from depression.

Plaintiff presented again with persistent nausea and vomiting and was admitted from September 1, 2001, to September 4, 2001, for treatment.  On September 6, 2001, plaintiff underwent surgery for acute cholecystitis.  She was discharged

---

[4]    The ALJ questioned plaintiff about the inconsistency between this ER note and plaintiff's claim that she quit using marijuana in June of 1997.  Plaintiff maintained at both of her hearings that she quit in 1997 and that the ER note is a mistake.

FINDINGS AND RECOMMENDATION - 7

on September 9, 2001.  The history taken from plaintiff prior to surgery indicated that she was a "28-year-old woman who apparently has been depressed all of her life . . . . She has been taking a variety of medications, from doxepin to trazodone to Paxil, none of which have really helped her with her depression . . . . She comes in now seeking assessment, very distraught, and kind of feels like she is 85 to 90 even though she is 28.  She has no energy.  She confines herself to home and then bed.  I am not sure what she does for fun . . . crying frequently."

On January 8, 2002, plaintiff presented to the ER with chronic cough for two months, was diagnosed with chronic cough and possible gastroesophageal reflux, and treated with Pepcid and Tensilon pearls.  The history taken from plaintiff indicated a "[p]rior history of child abuse with chronic anxiety disorder and depression."

On February 28, 2002, plaintiff presented to the ER with vomiting and diarrhea, was diagnosed with viral gastroenteritis, treated, and released.  The history taken from plaintiff indicated a history of depression.

On March 4, 2002, plaintiff presented to the ER with nausea and vomiting, was diagnosed with vomiting illness and hypokalemia, treated, and released.

FINDINGS AND RECOMMENDATION - 8

On March 11, 2002, plaintiff presented to the ER with depression, sleeplessness for three days, and diminished appetite.  Plaintiff reported that, due to changes in the healthcare system, she had been unable to refill her antidepressant regimen of Effexor and Doxepin, and had been unable to sleep since she ran out of her medications.  Following an assessment, plaintiff was given prescriptions for her medications and the doctor made a note to ensure plaintiff was adequately connected in the community for mental health services.

Between October 2001 and May 2002, plaintiff received mental health treatment from Unity Inc.  Dr. Regina Lanter, a treating physician, examined plaintiff on October 8, 2001.  Dr. Lanter observed that plaintiff was open and tearful throughout the interview and  noted a depressed affect and mood.  Dr. Lanter noted that plaintiff reported an inability "to keep a job more than a few months because she becomes depressed, overwhelmed and begins feeling sick," and described her social skills and leisure activities as poor.  Dr. Lanter noted that plaintiff was taking Nortryityline, Paxil and Temazepam.  The doctor diagnosed plaintiff with dysthymic disorder, status post gallbladder surgery, carpal tunnel disorder, insomnia and depression.  She rated plaintiff's GAF at 43.

On April 1, 2002, Dr. Lanter assessed plaintiff again. Plaintiff presented with complaints of poor sleep, low energy and appetite, anxiety about simple decisions, occasional fear of falling asleep, confusion, difficulty focusing and memory problems. Dr. Lanter noted she was taking Effexor and Doxepin among other medications. She diagnosed plaintiff with dysthymic disorder, staus post gallbladder surgery, carpal tunnel syndrome, oral and genital herpes, urinary tract infection, low income, insomnia, and chronic depression. She rated plaintiff's GAF at 43.

On May 2, 2002, Dr. Lanter assessed plaintiff yet again. She noted symptoms of depression, anxiety, insomnia, irritability, anorexia, poor concentration, poor memory, fatigue, and suicidal ideation. Dr. Lanter noted that plaintiff's mood and affect were depressed and that her memory was poor. She diagnosed plaintiff with recurrent and severe major depression without psychotic features, and dysthymia. Dr. Lanter also noted that plaintiff was very isolated socially and seemed to have contact only with her husband and children. She noted that the plaintiff reported feeling too depressed to interact socially. She also noted that, due to the severity of plaintiff's depression, her memory and concentration were compromised.

Between November 2001 and January 2002, plaintiff received mental health treatment from Network Behavioral Healthcare, Inc. Allison Kato, a treating clinician, examined plaintiff on November 28, 2001. She assessed a memory deficit possibly due to lack of nutrition and noted that the severity of plaintiff's eating disorder was not clear at that time. She also reported that plaintiff appeared confused as to her treatment history and that suicidal ideation was present. Kato diagnosed plaintiff with recurrent, chronic major depressive disorder without full inter episode recovery; cannabis abuse, sustained full remission; hepatitis B; and problems with economics and primary support group. She rated plaintiff's GAF at 41.

On January 10, 2002, Kato assessed plaintiff again. She noted that plaintiff reported feeling sad, hopeless, and upset. She observed that plaintiff appeared withdrawn and frustrated and that her affect shifted quickly from agitation to despair. She reported little change in plaintiff's condition over the two months of treatment at Network. Moreover, she noted that plaintiff reported difficulty with cooking and household chores. She also noted that plaintiff had difficulty completing tasks between sessions and that she had a history of high anxiety and stress in the workplace, including struggles with interpersonal interactions and decision making.

In an assessment completed March 7, 2002, Dr. Dick JepitDimmers, a non-examining physician, opined that plaintiff

is moderately limited in her ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) work in coordination with or proximity to others without being distracted by them; (5) interact appropriately with the general public; and (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Dr. JepitDimmers reported that plaintiff is capable of understanding and following simple routine tasks. He opined that "[i]n a slow paced environment claimant would be capable of sustaining adequate attention, concentration, and pace." He noted that plaintiff's reporting of poor social skills and discomfort around others would preclude public contact and close coworker contact.

In an assessment completed August 19, 2002, Dr. Peter LeBray, a non-examining physician, opined that plaintiff was moderately limited in her ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) work in coordination with or proximity to others without being distracted by them; (5) interact appropriately with the general public; and (6) set realistic goals or make plans independently of others. Dr. LeBray reported that plaintiff is capable of understanding, remembering, and carrying out very short, simple, routine, slow

paced instructions.  He opined that she is limited to brief, occasional coworker contact and no public contact and noted that she could benefit from assistance setting realistic goals and plans.

Donna Schreiner, MSN, PMHNP, a treating psychiatric mental health nurse practitioner, examined plaintiff on two occasions in March 2003.  In a letter dated an April 2, 2003, Nurse Schreiner reported that plaintiff was "severely depressed and ha[d] thoughts of suicide."  She opined that, given the chronicity of plaintiff's depression and multiple failed trials of antidepressants, her prognosis for recovery was guarded, and she could not manage the stress of working at that time.

Matt Schiff, a treating counselor at Cascadia Behavioral Healthcare, opined that plaintiff was markedly limited in her ability to:  (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) sustain an ordinary routine without special supervision; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact appropriately with the general public; (6) accept instructions and respond appropriately to criticism from supervisors; (7) get along with coworkers or peers without distracting them or exhibiting

behavioral extremes; and (8) set realistic goals or make plans independently of others.

Landa Duszynski, Mental Health Coordinator, a treating therapist, opined by letter dated May 7, 2003 that plaintiff's "medical and mental health needs continue to be barriers to employment."

Deb Young, PMHNP, a treating practitioner, opined that plaintiff was markedly limited in her ability to:  (1) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (2) complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods; and (3) to respond appropriately to changes in the work setting.

On September 15, 2003, plaintiff presented to OHSU with rectal pain and bleeding and was examined by Dr. Mark Whiteford. Her past medical history was recorded as including stress urinary incontinence, anemia, oral herpes, history of tuberculosis, depression and anxiety.  Dr. Whiteford noted that she was on several new medicines for depression and anxiety.  He diagnosed her with Fistula-in-ano and scheduled her for outpatient surgery.  Plaintiff underwent surgery on February 9, 2004, to repair Fistula-in-ano and a small traumatic anal fissure.  In a followup visit on February 23, 2004, Dr.

Whiteford discharged plaintiff from the clinic, noting an "[e]xcellent recovery after intersphincteric fistulotomy."

Dr. Gregory Cole, an examining psychologist, conducted a Neuropsychological Screening of plaintiff on October 16, 2004. Dr. Cole diagnosed plaintiff with major depression, recurrent; anxiety disorder; possible pain disorder; borderline intellectual functioning; personality disorder; stress associated with problems in her social environment, occupational problems, and economic problems. Dr. Cole rated plaintiff's GAF at 50. He noted that she exhibited a tendency to give up easily on tasks, that she put forth poor effort on various tasks, and that she worked at a slow pace. He also noted problems in attention and concentration.

Dr. Cole reported that plaintiff had no problems doing simple routine tasks or completing simple multi-step tasks. He noted that she exhibited severe memory deficiencies, but stated that this may have reflected her failure to give her best effort. Dr. Cole reported that plaintiff's "validity testing also indicated that her overall performance was noted to be invalid most likely because of her inadequate effort and careless responding to items provided her." Dr. Cole noted that plaintiff's personality testing reconfirmed her poor effort working on questions asked of her, as this testing was noted to be invalid and was also suggestive of the possibility that plaintiff tends to exaggerate her symptoms.

Dr. Cole opined that plaintiff's depression symptoms, fatigue, and lack of motivation would be her primary barriers to vocational success if she pursued job placement. Dr. Cole suggested that if plaintiff were awarded disability benefits, another individual should be assigned to assist her in managing her money. Finally, Dr. Cole opined that the results of his evaluation were generally consistent with the medical records that had been made available to him.

Hearing Testimony

1. Plaintiff's Testimony

a. May 14, 2003 hearing

Plaintiff testified that she received her GED in or about 1990. She testified that her depression started when she was about two or three and would wake up at night crying with nightmares and bedwetting, and her mother would lock her outside. She testified that she did not receive treatment and medication for her depression until 1991 when she moved to Oregon. Plaintiff testified that she suffers from depression every day, has suicidal thoughts all of the time, and continues to live for her two sons. She also testified that she closes herself up in her room, sometimes for 12 to 14 hours a day, so that her children will not see her cry.

Plaintiff testified that she suffers from anxiety, worrying extensively about her children, bills and other problems. She testified that she has tried numerous antidepressants, and takes

medicines for physical problems such as acid reflux. In addition to her psychological problems, plaintiff testified that she suffers from urinary inflamation, incontinence, and bilateral carpal tunnel syndrome secondary to 28 or 29 years of compulsively rubbing a pillow for comfort. Plaintiff also testified that she suffers from memory and concentration problems and dizziness as a result of having been on many different medications for her depression. She testified that she cannot do more than one thing at a time.

Plaintiff testified that she used marijuana extensively in the past and had withdrawal symptoms after she quit in June of 1997. She testified that she was generally working after she quit smoking marijuana and that she was fired from her janitorial job because she missed so many days for doctors' appointments. She also testified that the bending, stooping, and chemicals involved with the janitorial work was a problem with her antidepressant medications. She testified that her carpal tunnel limits her ability to grasp, grab and hold things.

When asked about a 1999 entry in her medical records that indicated that she was using marijuana approximately every other day, plaintiff maintained that she stopped smoking marijuana in 1997.

b.  <u>September 1, 2004 hearing</u>

Plaintiff testified that in early 2004 she was treated at OHSU for an anal fissure condition and underwent surgery in February 2004.  She also testified that since the first hearing in 2003, her depression had worsened and that due to budget constraints, she had been dropped from individual counseling and could only attend group therapy on Mondays and Tuesdays.  She testified that she attended her sessions regularly unless she had a conflicting doctor's appointment or the session was cancelled.  She also testified that she sees a mental health nurse practitioner to get her medications and that she was taking Doxepin, Zoloft and Gabitril to treat her depression and insomnia.

Plaintiff testified that she had not been looking for a job and that she and her 14 and 15-year-old sons were surviving on government assistance.  She testified that she was married, but that her husband had left the home and was not working.  Plaintiff testified that she sometimes drives her car and that she has a bus pass.  In terms of caring for her family, plaintiff testified that there is a medical clinic around the corner that her children can go to and that she frequently sends them to a nearby Safeway to do shopping.

Plaintiff testified that she was not currently using marijuana and that she had stopped using it in June of 1997.  Plaintiff further testified that after she quit using, she went

through a period of a couple of months when she was feeling better and was focused on sit-ups, losing weight and applying for work.  When asked by the ALJ if she had undergone urinalysis (UAs) that would support her assertion that she was not using marijuana, plaintiff answered that she had not had any UAs but that she was willing to take a drug test.  Plaintiff testified that her depression and her need to attend group therapy were the factors that kept her from working.

Plaintiff also testified that she had experienced relief for a couple of months following her anal fissure surgery in February 2004, but that the problem had returned and she had difficulty sitting and that the friction from walking aggravated her pain.

2.   Lay Witness, Clark A. Thompson

Plaintiff's husband testified that he had lived with plaintiff from 1995 to early 2004.  The witness testified that despite her youth, in all the time he has known her, plaintiff never wanted to go out to do things; that she was often in a stupor; that she was sad and upset all of the time and any effort on his part to console her made her irritable; that she had difficulty sleeping; that she was moody; and that she had to rub a pillow for comfort.   Mr. Thompson testified that plaintiff quit smoking marijuana in 1997 and demanded that he quit drinking or leave.   He also testified that he had difficulty keeping a job and that he had left plaintiff in early

2004, in part, to ease her burden by giving her one less mouth
to feed.

3.   Vocational Expert, May 14, 2003 hearing[5]

     The ALJ posed a hypothetical to the vocational expert (VE)
describing an individual of plaintiff's age, with plaintiff's
education and work experience, who had no specific exertional
limits, who could perform simple, one, two, three step work,
routine in nature, but should not engage in any work involving
constant, repetitive use of the hands for fine manipulation.
The hypothetical also proscribed work involving public contact
of any consequence and work involving anything beyond limited
coworker contact.

     The VE testified that the individual described could work
as a janitor, motel cleaner, and dining room attendant.

     When the ALJ asked the VE to consider a second hypothetical
which added to the first an assumption that the individual would
miss work two or more times per month, the VE testified that
such an individual could not remain competitively employed.

     In addition, when asked by plaintiff's attorney to consider
the impact of multiple moderate restrictions in different
functional categories, the VE testified that at some point a
collection of moderate restrictions would compromise plaintiff's
ability to do even simple, routine, repetitive work.

--------

     [5]   Though a VE was also present at the September 2004
hearing, the ALJ did not call her for questioning.

<u>Disability Analysis</u>

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

<u>Step One</u>. The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA). A claimant engaged in such activity is not disabled. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two. 20 C.F.R. § 4041520(b).

<u>Step Two</u>. The Commissioner determines whether the claimant has one or more severe impairments. A claimant who does not have such impairment is not disabled. If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three. 20 C.F.R. § 404.1520©).

<u>Step Three</u>. Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant who has such an impairment is disabled. If claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the

claimant's case proceeds under Step Four.   20 C.F.R. §
404.1520(d).

Step Four.   The Commissioner determines whether the
claimant is able to perform work he or she has done in the past.
A claimant who can perform past relevant work is not disabled.
If the claimant demonstrates he or she cannot do work performed
in the past, the Commissioner's evaluation of the claimant's
case proceeds under Step Five.   20 C.F.R. § 404.1520(e).

Step Five.   The Commissioner determines whether the
claimant is able to do any other work.   A claimant who cannot
perform other work is disabled.   If the Commissioner finds that
the claimant is able to do other work, the Commissioner must
show that a significant number of jobs exist in the national
economy that the claimant can do.   The Commissioner may satisfy
this burden through the testimony of a VE or by reference to the
Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P,
Appendix 2.   If the Commissioner demonstrates that a significant
number of jobs exist in the national economy that the claimant
can do, the claimant is not disabled.   If the Commissioner does
not meet this burden, the claimant is disabled.   20 C.F.R. §
404.1520(f)(1).

At steps One through Four, the burden of proof is on the
claimant.   Tackett, 180 F.3d at 1098.   At Step Five, the burden
shifts to the Commissioner to show that the claimant can perform

FINDINGS AND RECOMMENDATION - 22

jobs that exist in significant numbers in the national economy. Id.

### ALJ's Decision

In the first two steps of the disability analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset of her disability, and that plaintiff's carpal tunnel syndrome and major depressive disorder were severe impairments.

At step three, the ALJ found that these impairments did not meet or medically equal the criteria set out in the listings.

The ALJ found that plaintiff's allegations concerning her limitations were not "totally credible," and that plaintiff retained the residual functional capacity

> for simple one to three step tasks and should have no interaction with the public and only occasionally [sic] interaction with co-workers . . . . Given her carpal tunnel syndrome, she has the additional limitation of no constant repetitive usage of her hands for fine manipulation.

At step four, the ALJ found that plaintiff was not disabled because she could perform her past relevant work as a janitor.

Notwithstanding his finding at step four, the ALJ proceeded to evaluate step five and concluded that plaintiff could "make an adjustment to other jobs which exist in significant number is [sic] the national economy." As examples of such work, the ALJ cited work as a motel cleaner and dining room attendant. Accordingly, the ALJ determined that plaintiff was not disabled within the meaning of the Social Security Act.

FINDINGS AND RECOMMENDATION - 23

## Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

<u>Discussion</u>

Plaintiff contends that the ALJ erred in failing to pose a complete and proper hypothetical to the VE; in failing to incorporate certain mental limitations into his RFC assessment; and in failing to meet his burden in identifying specific jobs plaintiff can perform in light of the combination of her limitations.

I.    <u>Adequacy of the ALJ's hypothetical</u>

In order to be accurate, an ALJ's hypothetical to a VE must set out all of the claimant's impairments. <u>Gallant v. Heckler</u>, 753 F.2d 1450, 1456 (9th Cir. 1984)(<u>citing</u> <u>Baugus v. Secretary of</u> <u>Health & Human Services</u>, 717 F.2d 443, 447 (8th Cir. 1983)). The ALJ's depiction of the claimant's limitations set out in the hypothetical must be "accurate, detailed, and supported by the medical record." <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1101 (9th Cir. 1999). If the assumptions included in the hypothetical are not supported by the record, a VE's opinion that a claimant can work does not have evidentiary value. <u>Gallant</u>, 753 F.2d at 1456.

Plaintiff contends that the VE's opinion that plaintiff could perform her past work and other work in the national economy lacked evidentiary value because the ALJ's hypothetical omitted significant mental and physical impairments. She asserts that the ALJ's hypothetical should have included a diagnosis of borderline intellectual functioning; moderate

limitations in plaintiff's ability to maintain concentration, persistence and pace; and an anal fissure condition.

Dr. Cole, an examining physician, diagnosed plaintiff with major depression, anxiety disorder, borderline intellectual functioning, personality disorder, and stress associated with problems in her social environment, occupational problems and economic problems. In addition, Dr. Cole noted that the results of his evaluation were generally consistent with the medical records made available to him and opined that plaintiff should have assistance in managing any disability funds she might receive. However, the ALJ gave the assessment and opinions of Dr. Cole little weight because he found that:

> A thorough review of Dr. Cole's report reveals he has abandoned his objectivity and has assumed the role of disability advocate on the claimant's behalf as he has chosen to ignore validity indicators, which were suggestive of poor effort on testing, exaggerations of symptoms and the possibility she was actually doing poorly on purpose, and has relied on the claimant's subjective complaints as well as the very mental functioning testing he has drawn into question as he reported he felt such testing was invalid and not a reliable indicator of the claimant's actually [sic] abilities.

Opinions of examining physicians are entitled to greater weight than those of nonexamining physicians. <u>Pitzer v. Sullivan</u>, 908 F.2d 502, 506 (9th Cir. 1990). An ALJ must provide clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician, <u>id</u>., and must provide specific and legitimate reasons that are supported by substantial evidence in the record for rejecting an examining

physician's opinion that is contradicted by another physician. Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995).

Notwithstanding the Commissioner's assertion that the ALJ's reasons for discounting Dr. Cole's opinions were sufficient because he identified what he found to be an internal contradiction in Dr. Cole's report, I conclude that the ALJ's determination that a discrepancy existed between the physician's objective testing results and his ultimate conclusions is not supported by substantial evidence in the record. The ALJ also afforded the assessments and opinions of Dr. Lanter, plaintiff's treating physician, little weight because he found them to be based on plaintiff's subjective complaints and because no objective testing was performed to substantiate or determine the severity of her impairments. Though plaintiff has not specifically challenged the ALJ's decision to discount Dr. Lanter's opinion, I note for the record my conclusion that the ALJ's analysis of these opinions was flawed as well.

Interpreting the results of objective neuropsychological tests and factoring such results into a medical diagnosis involves the application of specialized medical expertise. Dr. Cole was best qualified to fully consider and account for the results of tests he gave plaintiff, and a careful reading of his report supports only the conclusion that he fully considered validity issues in reaching his diagnosis. The ALJ has failed to present evidence demonstrating that Dr. Cole reached his

diagnosis without first appropriately considering, weighing, and accounting for the results of his objective testing. Accordingly, I conclude that the ALJ failed to provide clear and convincing reasons for rejecting Dr. Cole's opinions.

When inadequate reasons are provided for rejecting the opinion of a treating or examining physician, that opinion is credited as a matter of law. <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1995). A reviewing court then has discretion to remand for further administrative proceedings or for a finding of disability and an award of benefits. <u>See</u>, <u>e.g.</u>, <u>Stone v. Heckler</u>, 761 F.2d 530, 533 (9th Cir. 1985).

Whether an action is remanded for an award of benefits or for further proceedings depends on the likely utility of additional proceedings. <u>Harman v. Apfel</u>, 211 F.3d 1172, 1179 (9th Cir. 2000). A reviewing court should credit evidence and remand for a finding of disability and an award of benefits if: 1) the ALJ failed to provide legally sufficient reasons for rejecting evidence; 2) there are no outstanding issues to be resolved before a determination of disability can be made; and 3) it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence in question were credited. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1292 (9th Cir. 1996).

Under the guidance of these decisions, I recommend remanding this action for an award of benefits. The ALJ clearly failed to provide legally sufficient reasons for rejecting the

conclusions of Dr. Cole.  Moreover, there are no outstanding issues to be resolved before a determination of plaintiff's disability can be made, because in the opinion of Dr. Cole, an examining physician, plaintiff suffers from major depression, anxiety disorder, borderline intellectual functioning, personality disorder, and stress associated with problems in her social environment, occupational problems and economic problems. Significantly too, Dr. Cole noted that the results of his evaluation are generally consistent with the medical records made available to him.  As summarized above, the voluminous record documents plaintiff's long history of debilitating extreme major depression, chronic anxiety, memory and concentration deficits, and a myriad of physical problems.  In addition, Dr. Cole opined that plaintiff should have assistance in managing any disability funds she might receive.  Under these circumstances, an ALJ who credited the opinions of Dr. Cole and properly applied the relevant laws and regulations to his or her consideration of all the evidence, would have been required to find plaintiff disabled.  Accordingly, the Commissioner's decision should be reversed and this action should be remanded for an award of benefits.

II.  <u>Other issues</u>

My conclusion that the Commissioner's decision should be reversed and this action be remanded for an award of benefits because the ALJ failed to provide clear and convincing reasons

FINDINGS AND RECOMMENDATION - 29

for rejecting the uncontroverted opinions of plaintiff's examining physician makes it unnecessary to reach the balance of plaintiff's arguments. However, in order to create a full record for review, I will briefly address the balance of plaintiff's arguments.

a.    Failure to conduct a proper RFC assessment

Plaintiff contends that the ALJ's RFC assessment was deficient because he failed to fully incorporate all plaintiff's impairments noted by State agency psychologists, Drs. Wimmers and LeBray. Specifically, plaintiff contends that the ALJ failed to incorporate the doctors' opinions that plaintiff is moderately limited in her ability to maintain concentration, persistence, and pace. In his decision, the ALJ seemingly conceded that plaintiff's mental impairments caused her "moderate difficulties in maintaining concentration, persistence or pace." This finding was further buttressed by Dr. Wimmers's opinion that plaintiff would be capable of sustaining adequate attention, concentration and pace in a "slow paced environment." Nevertheless, the ALJ did not include a limitation in maintaining concentration, persistence, and pace in his RFC assessment.

An ALJ must consider the findings of State agency medical consultants, must treat the opinions of these non-examining sources as expert opinion evidence, and must include an explanation of the weight given to the opinions of medical

FINDINGS AND RECOMMENDATION - 30

experts in his decision.  SSR 96-6p.  An ALJ must provide clear and convincing reasons for rejecting uncontroverted expert opinion, and must provide specific, legitimate reasons for rejecting controverted expert opinion.  Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).

_____The ALJ here did not provide a reasoned explanation for not including the non-controverted opinions of non-examining medical experts concerning plaintiff's moderate limitations in maintaining concentration, persistence, and pace.  As noted above, when asked to consider the impact multiple moderate restrictions would have on plaintiff's ability to work, the VE testified as follows:

> [W]e're assessing 20 different categories and I think even extracting the ones which would not seem to apply to the hypothetical, there are any number which I think, as best as I would understand it, with a moderate restriction, it might not preclude employment but it's going to be a very close call.  There's just too great a collection of compromises at all, at the moderate level and, at some point, I think a decision must be made that the impact, even upon the simple, routine, repetitive work offered is going to be held in compromise.

This VE testimony undermines the Commissioner's argument that the ALJ, by limiting plaintiff to simple, one to three step tasks, properly accounted for plaintiff's limitations in the area of concentration, persistence, and pace.  Accordingly, the ALJ's failure to incorporate plaintiff's moderate limitations in this area weakens his ultimate conclusion that plaintiff is not disabled within the meaning of the Social Security Act.

b.  Development of the record

Plaintiff contends that the ALJ failed to fully develop the record concerning her physical impairment involving a recurring anal fissure condition.  I disagree.  As the Commissioner correctly notes, an ALJ has a duty to further develop the record when the evidence is ambiguous or is inadequate to allow for proper evaluation of the evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  However, here, the record as to plaintiff's anal fissure was adequate for the ALJ to properly evaluate its significance and effect on plaintiff's functional capacity.

c.  Failure to meet his burden in identifying specific jobs plaintiff can perform in light of the combination of her limitations.

The ALJ's finding that plaintiff could perform the specific jobs listed in his decision, namely janitor, motel cleaner, and dining room attendant, is not supported by substantial evidence in the record for the following reasons.

First, to the extent that the ALJ failed to identify and incorporate certain mental impairments in his RFC assessment, the corresponding hypothetical he presented to the VE was incomplete.  In order to be accurate, an ALJ's hypothetical to a VE must set out all of the claimant's impairments.  Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (citing Baugus v. Secretary of Health & Human Services, 717 F.2d 443, 447 (9th

FINDINGS AND RECOMMENDATION - 32

Cir. 1983)).  The ALJ's depiction of the claimant's limitations set out in the hypothetical  must be "accurate, detailed, and supported by the medical record."  <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1101 (9th Cir. 1999).  If the assumptions included in the hypothetical are not supported by the record, a VE's opinion that a claimant can work does not have evidentiary value. <u>Gallant</u>, 753 F.2d at 1456.

As discussed above, the ALJ failed to include a diagnosis of borderline intellectual functioning and moderate limitations in plaintiff's ability to maintain concentration, persistence, and pace in either his RFC assessment or in the hypothetical posed to the VE.  Because the ALJ erred in omitting those impairments in his hypothetical, the VE's opinion here lacks evidentiary value.

Second, the hypothetical that the ALJ posed to the VE is internally inconsistent with the ALJ's own specific finding that plaintiff "should have no interaction with the public."  This total preclusion of public contact is consistent with the assessments of Drs. Wimmers and LeBray.  However, in the hypothetical posed to the VE, the ALJ reduced this limitation from a total exclusion of public contact to "no public contact of any consequence."

The demands of the specific jobs listed are beyond the limitations identified in the ALJ's decision.  As plaintiff correctly notes, the janitor, motel cleaner and dining room

attendant jobs all require some public contact. Plaintiff's Brief, pp. 10-12 (<u>citing</u> <u>Dictionary of Occupational Titles</u>, U.S. Dept. of Labor, DOT No. 382.664-010, 323.687-014, 311.677-018 (4th ed. 1991)). This required interaction with the public, however brief, is inconsistent with the ALJ's findings, consistent with the assessments of Drs. Wimmers and LeBray, which preclude any public contact.

<u>Recommendation</u>

_____For the reasons identified above, a judgment should be entered reversing the decision of the Commissioner and remanding this action to the agency for an award of benefits.

<u>Scheduling Order</u>

_____The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due June 26, 2006. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

A party may respond to another party's objections within 10 days after service of a copy of the objection. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or the latest date for filing a response.

DATED this 8th day of June, 2006.

/s/  John Jelderks
John Jelderks
United States Magistrate Judge